## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

Case No: 1:21-cv-00944

Honorable:

REEDY GROUP INC.,

      Plaintiff,

v.

UNITED STATES SMALL BUSINESS ADMINISTRATION; ISABEL CASILLAS GUZMAN, in her Official Capacity as the Administrator of the United States Small Business Administration; JAMES RIVERA, in his Official Capacity as the Associate Administrator for the Office of Disaster Assistance; and THE UNITED STATES OF AMERICA,

      Defendants.

## PLAINTIFF'S VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND REVIEW OF ADMINISTRATIVE ACTION

## <u>JURY DEMAND</u>

COMES NOW Reedy Group Inc., and for its Complaint, hereby states the following:

## <u>INTRODUCTION</u>

1.     This is a civil action wherein Plaintiff seeks an immediate, emergency, Temporary Restraining Order, and further injunctive relief, to restrain Defendants from violating its constitutional rights by discriminating against businesses and workers who are entitled to benefits from the Shuttered Venue Operators Grant provisions (the "SVOG"), Sec. 324 of Title III, of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (the "Economic Aid Act" or simply, "EAA"), Pub. L. 116-260, 134 Stat. 1182 (2021), as amended by Section 5005 of Title V, of the American Rescue Plan Act of 2021, Pub. L. 117-2 (2021), now codified at 15 U.S.C. §

9009a. The SVOG is a completely new program created by Congress in response to the COVID-19 Pandemic (the "Pandemic," or simply, "COVID") following the President declaring a national emergency in March of 2020. Congress created the SVOG to provide grants to, among others, live venue operators and promoters, provided all the relevant definitions for the program, and tasked the Administrator of SBA, and/or her designee, with awarding grants to eligible entities. In particular, Congress determined that the grant amount "shall be" the lesser of two calculation methods, but in no instance more than $10,000,000.00. In January of 2021, SBA began publishing "SVOG Frequently Asked Questions" as well as various other guides in the form of checklists, eligibility matrices, and user guides (collectively the "Program Guides") to implement the SVOG. Despite Plaintiff's complete eligibility and precise compliance with 15 U.S.C § 9009a, the Program Guides, and SBA's various requests for technical corrections, Plaintiff's SVOG application has been funded, after technical correction response, and a reconsideration request, at a mere 8.6% of the total amount to which Plaintiff is entitled (combined primary and supplemental SVOG awards), despite Congress's explicit use of mandatory language as to the amount of SVOG awards. SBA's decisions defy Congress's words in the statute, exceed SBA's authority, unlawfully discriminates against Plaintiff, violates Plaintiff's Fifth Amendment rights, and is otherwise invalid under the Administrative Procedures Act, 5 U.S.C. § 500, *et seq*. Because Plaintiff has exhausted its administrative remedies and because the deadline of December 31, 2021, for incurring eligible expenses under the SVOG is rapidly approaching, Plaintiff seeks expedited judicial review of SBA's final administrative decisions.

2.      Specifically, this action challenges: the SVOG award amount of Reedy Group Inc.'s Consolidated SVOG Application, as defined and discussed below.

## JURISDICTION AND VENUE

2

3.     Jurisdiction is conferred on this Court for the resolution of the substantial constitutional questions presented here by virtue of 28 U.S.C. § 1331; 28 U.S.C. § 1343(a)(3), (4); 28 U.S.C. § 1346(a)(2); and 28 U.S.C. § 1361.

4.     Authority for judicial review of agency action is further provided by 5 U.S.C. §§ 702 and 704, the former of which states:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5.     The prayer for declaratory relief is founded in part on Rule 57 of the Federal Rules of Civil Procedure as well as in 28 U.S.C. § 2201, the latter of which provides that:

> . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. . . .

6.     Federal question jurisdiction for the request for attorney fees and costs is conferred by 28 U.S.C. § 2412.

7.     Jurisdiction of this Court to grant injunctive relief is conferred upon this Court by Rule 65 of the Federal Rules of Civil Procedure, and by 28 U.S.C. § 2202, the latter of which provides: "Further necessary or proper relief on a declaratory judgment or decree may be granted after reasonable notice and hearing, against any adverse party whose right shave been determined by such judgment."

8.      No other action, civil or criminal, is pending in any state court involving the Plaintiff regarding the activities and events here.

9.      This suit is authorized by law to redress deprivations of rights, privileges, and immunities secured by the First and Fifth Amendments to the United States Constitution, and for declaratory and injunctive relief.

10.     Pursuant to 28 U.S.C. § 1391(e), venue in this Court is appropriate as Plaintiff is located in the Western District of Michigan; the Small Business Administration operates and/or conducts operations; has awarded SBA aid to businesses and/or persons within the Western District of Michigan; and the injury complained of and acts causing that injury have occurred and will continue to occur in the Western District of Michigan.

## PARTIES

*Plaintiff*

11.     Plaintiff Reedy Group, Inc. is a Michigan corporation duly organized and authorized to do business in the State of Michigan. Reedy Group, Inc. does business as RG at 310 E. Michigan Ave., Ste. 504 in Kalamazoo, Michigan.

*Defendants*

12.     Defendant United States Small Business Administration (the "SBA") is an independent federal agency created and authorized pursuant to 15 U.S.C. § 633, *et seq*. The SBA maintains a district office at 477 Michigan Ave., Ste. 1819 in Detroit, Michigan and a Small Business Development Center at 50 Front Ave. SW in Grand Rapids, Michigan, which is within the Western District of Michigan.

13.     Defendant Isabel Casillas Guzman ("Guzman," or the "Administrator") is the Administrator of the SBA, a Cabinet-level position, and is sued in her official capacity only, as the Administrator of the SBA.

14.     Authority to sue the Administrator is granted by 15 U.S.C. § 634(b), which states, in part:

4

In the performance of, and with respect to, the functions, powers, and duties vested in him by this chapter the Administrator may—(1) sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy . . . .

15.   Defendant James Rivera ("Rivera") is the Associate Administrator for the SBA's Office of Disaster Assistance, an executive level position within the SBA. Defendant Rivera is sued in his official capacity only, as the Associate Administrator for the SBA's Office of Disaster Assistance.

16.   Defendant United States of America is a sovereign nation dedicated to the protection of life, liberty, and property as set forth in the Bill of Rights and other provisions and amendments to the Constitution of the United States.

17.   Plaintiff does not seek damages and prays only for declaratory and injunctive relief under 5 U.S.C. § 701, *et seq.* in order to restrain the actions of the SBA, the Administrator, and Rivera, in each of their official capacities.

## RELEVANT STATUTORY PROVISIONS AND ADMINISTRATIVE GUIDANCE

18.   Congress created the SBA on July 30, 1953. Small Business Act of 1953, Pub. L. 83-163, tit. II, 67 Stat. 232, *et seq.*, (1953), with the purpose "to 'aid, counsel, assist and protect, insofar as is possible, the interests of small business concerns.'" https://www.sba.gov/document/policy-guidance--small-business-act (last visited May 11, 2021).

19.   "The intent of the CARES Act, the Economic Aid Act, and the American Rescue Plan Act is that SBA provide relief to America's small businesses and nonprofits expeditiously." 86 Fed. Reg. 15084, attached hereto as **Exhibit A** and incorporated by reference as though fully set forth herein.

20.   The SVOG provides the following relevant definitions:

The term "eligible person or entity" means a live venue operator or promoter, theatrical producer, or live performing arts organization operator, a relevant museum operator, a motion picture theatre

5

operator, or a talent representative that meets the following requirements:

(i) The live venue operator or promoter, theatrical producer, or live performing arts organization operator, the relevant museum operator, the motion picture theatre operator, or the talent representative--

   (I) was fully operational as a live venue operator or promoter, theatrical producer, or live performing arts organization operator, a relevant museum operator, a motion picture theatre operator, or a talent representative on February 29, 2020; and

   (II) has gross earned revenue during the first, second, third, or, only with respect to an application submitted on or after January 1, 2021, fourth quarter in 2020 that demonstrates not less than a 25 percent reduction from the gross earned revenue of the live venue operator or promoter, theatrical producer, or live performing arts organization operator, the relevant museum operator, the motion picture theatre operator, or the talent representative during the same quarter in 2019.

(ii) As of the date of the grant under this section--

   (I) the live venue operator or promoter, theatrical producer, or live performing arts organization operator is or intends to resume organizing, promoting, producing, managing, or hosting future live events described in paragraph (3)(A)(i);
   (II) the motion picture theatre operator is open or intends to reopen for the primary purpose of public exhibition of motion pictures;
   (III) the relevant museum operator is open or intends to reopen; or
   (IV) the talent representative is representing or managing artists and entertainers.

(iii) The venues at which the live venue operator or promoter, theatrical producer, or live performing arts organization operator promotes, produces, manages, or hosts events described in paragraph (3)(A)(i) or the artists and entertainers represented or managed by the talent representative perform have the following characteristics:

   (I) A defined performance and audience space.
   (II) Mixing equipment, a public address system, and a lighting rig.
   (III) Engages 1 or more individuals to carry out not less than 2 of the following roles:
   (aa) A sound engineer.
   (bb) A booker.
   (cc) A promoter.
   (dd) A stage manager.
   (ee) Security personnel.
   (ff) A box office manager.

(IV) There is a paid ticket or cover charge to attend most performances and artists are paid fairly and do not play for free or solely for tips, except for fundraisers or similar charitable events.

6

(V) For a venue owned or operated by a nonprofit entity that produces free events, the events are produced and managed primarily by paid employees, not by volunteers.

(VI) Performances are marketed through listings in printed or electronic publications, on websites, by mass email, or on social media.

\*        \*        \*

(vi)[:]

(I) The live venue operator or promoter, theatrical producer, or live performing arts organization operator, the relevant museum operator, the motion picture theatre operator, or the talent representative does not have, or is not majority owned or controlled by an entity with, any of the following characteristics:

(aa) Being an issuer, the securities of which are listed on a national securities exchange.

(bb) Receiving more than 10 percent of gross revenue from Federal funding during 2019, excluding amounts received by the live venue operator or promoter, theatrical producer, or live performing arts organization operator, the relevant museum operator, the motion picture theatre operator, or the talent representative under the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.).

(II) The live venue operator or promoter, theatrical producer, or live performing arts organization operator, the relevant museum operator, the motion picture theatre operator, or the talent representative does not have, or is not majority owned or controlled by an entity with, more than 2 of the following characteristics:

(aa) Owning or operating venues, relevant museums, motion picture theatres, or talent agencies or talent management companies in more than 1 country.
(bb) Owning or operating venues, relevant museums, motion picture theatres, or talent agencies or talent management companies in more than 10 States.

(cc) Employing more than 500 employees as of February 29, 2020, determined on a full-time equivalent basis in accordance with subparagraph (C).

15 U.S.C. § 9009a(a)(1)

(3) Live venue operator or promoter, theatrical producer, or live performing arts organization operator

The term "live venue operator or promoter, theatrical producer, or live performing arts organization operator"—

(A) means—

(i) an individual or entity—

(I) that, as a principal business activity, organizes, promotes, produces, manages, or hosts live concerts, comedy shows, theatrical productions, or other events by performing artists for which—

(aa) a cover charge through ticketing or front door entrance fee is applied; and

(bb) performers are paid in an amount that is based on a percentage of sales, a guarantee (in writing or standard contract), or another mutually beneficial formal agreement; and

(II) for which not less than 70 percent of the earned revenue of the individual or entity is generated through, to the extent related to a live event described in subclause (I), cover charges or ticket sales, production fees or production reimbursements, nonprofit educational initiatives, or the sale of event beverages, food, or merchandise; or

(ii) an individual or entity that, as a principal business activity, makes available for purchase by the public an average of not less than 60 days before the date of the event tickets to events—

(I) described in clause (i)(I); and

(II) for which performers are paid in an amount that is based on a percentage of sales, a guarantee (in writing or standard contract), or another mutually beneficial formal agreement; and

(B) includes an individual or entity described in subparagraph (A) that—

(i) operates for profit;

(ii) is a nonprofit organization;

(iii) is government-owned; or

(iv) is a corporation, limited liability company, or partnership or operated as a sole proprietorship.

15 U.S.C. § 9009a(a)(3).

21.     As to SVOG initial grant award amounts, the SVOG states:

(c) Amount

(1) Initial grants

(A) In general

Subject to subparagraphs (B) and (C), a grant under subsection (b)(2) shall be in the amount equal to the lesser of—

(i)[:]

(I) for an eligible person or entity that was in operation on January 1, 2019, the amount equal to 45 percent of the gross earned revenue of the eligible person or entity during 2019; or

(II) for an eligible person or entity that began operations after January 1, 2019, the amount equal to the product obtained by multiplying—

(aa) the average monthly gross earned revenue for each full month during which the eligible person or entity was in operation during 2019; by

(bb) 6; or

(ii) $10,000,000.

15 U.S.C. § 9009a(c)(1).

22.    As to supplemental grants and the maximum total amount, SVOG states:

(2) Supplemental grants

A grant under subsection (b)(3) shall be in the amount equal to 50 percent of the grant received by the eligible person or entity under subsection (b)(2).

(3) Overall maximums

The total amount of grants received under paragraphs (2) and (3) of subsection (b) by an eligible person or entity shall be not more than $10,000,000.

15 U.S.C. § 9009a(c)(2)-(3).

23.    The SVOG expressly modifies SBA's affiliation rules permitting multiple business entities to apply:

(D) Multiple business entities

Each business entity of an eligible person or entity that also meets the requirements under subparagraph (A) and that is not described in subparagraph (B) shall be treated by the Administrator as an independent, non-affiliated entity for the purposes of this section.

15 U.S.C. § 9009a(a)(1)(D). But the number of affiliated entities that may receive awards is capped at five:

> (D) Limits on number of initial grants to affiliates
>
> Not more than 5 business entities of an eligible person or entity that would be considered affiliates under the affiliation rules of the Administration may receive a grant under this paragraph.

15 U.S.C. § 9009a(a)(2)(D).

24.     SVOG funds must "be used for costs incurred during the period beginning on March 1, 2020, and ending on December 31, 2021." 15 U.S.C. § 9009a(d)(1)(A). However, the SVOG permits an extension for supplemental grants in which case "amounts received under either grant under this section may be used for costs incurred during the period beginning on March 1, 2020, and ending on June 30, 2022." Id.

25.     The SVOG also states that "amounts received under a grant under this section that are not expended on or before the date that is 1 year after the date of disbursement of the grant" must be returned. 15 U.S.C. § 9009a(d)(1)(B). Again, the SVOG permits an extension for supplemental grants such that "the eligible person or entity shall return to the Administrator any amounts received under either grant under this section that are not expended on or before the date that is 18 months after the date of disbursement to the eligible person or entity of the grant under subsection (b)(2)." Id.

26.     The Administrative Procedures Act requires:

> (b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—
>
>> (1) a statement of the time, place, and nature of public rule making proceedings;
>>
>> (2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply—

(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

5 U.S.C. § 553(b).

27.     On its website, SBA has 12 versions of the "SVOG Frequently Asked Questions." Each version is attached hereto as **Exhibits B** through **M** and are hereby incorporated by reference as though fully set forth herein.

28.     SBA, via its website, published an "SVOG Eligibility Matrix," which is attached hereto as **Exhibit N** and is hereby incorporated by reference as though fully set forth herein.

29.     As is discussed below, Plaintiff submitted an SVOG application on or about April 26, 2021. Version 10 of the FAQs has an effective date of 4-23-2021 and was, thus, the FAQ in effect when Plaintiff submitted its original SVOG application.

30.     The current version of the FAQ, Version 12, **Ex K**, states, in relevant part:

**69. If an individual or entity owns a venue under one LLC (Venue LLC) and operates it under another LLC (Operator) can it apply for an SVOG under one LLC and use the funds to pay costs associated with both LLCs? For example, if Venue LLC received an SVOG award could it pay salaries incurred under Operator LLC, which employs the staff that run the events at the venue, as well as paying the mortgage and utility bills it owes?**

No. Two or more separate legal entities can only be included in one SVOG award if one of them owns more than 50% of the others OR if a single entity or individual owns more than 50% of all of them.

**133. What will the SBA do if an eligible entity has two or more business activities with essentially the same level of combined revenues, costs, staff time, assets, contracts, etc.?**

Where an eligible entity has multiple lines of business that are essentially tied regarding their share of the entity's overall business activity, they will all be deemed its principal business activities.

**189. If an eligible entity has multiple lines of business activity, including a line(s) not covered by the SVOG program (e.g., provides talent representation and financial services for athletes and entertainers), should it include earned revenue derived from those business lines or just the portion that relates to the SVOG?**

Yes. If an entity's primary business activity places it within one of the categories of an eligible entity under the Economic Aid Act, then it should use its gross earned revenue across all business activities and not exclude any non-SVOG revenue streams. The entity would also need to satisfy the requirement that the principal line of business makes it eligible for an SVOG.

**212. For entities with subsidiaries, does each entity need to meet the eligibility criteria independently?**

No. Subsidiaries only need to meet the eligibility criteria independently if they are applying for SVOG awards on their own. Additionally, per the Economic Aid Act, subsidiary entities that qualify for an SVOG will not be treated as affiliates of their parent entity or one another.

**214. May a parent company include its subsidiaries in an SVOG application or do separate applications need to be submitted for a parent and each subsidiary?**

A parent company may include its subsidiaries in an SVOG application. While subsidiaries can apply for SVOGs on their own, they are not required to do so. A parent company can submit an application that includes some or all its subsidiaries if it wishes to.

**220. Can 2 or more firms affiliated due to their common ownership by another firm apply jointly?**

While affiliates may apply for the SVOG program in their own name or may be included in an application submitted by their ultimate parent entity, they cannot team up together on an application unless one of the firms owns more than 50% of the other.

For example, if Company A owns 100% of Company B, which owns 100% of Company C, then Company C could apply in its own name or be included in either A or B's application. Conversely, if Companies B and C are both 100% owned by Company A then they could each apply in their own name or be included in A's application, but B and C could not pair up together to submit an SVOG application.

**224. If an entity is disregarded for tax purposes and doesn't file its own tax returns, should the disregarded entity apply for an**

**SVOG or should the entity that files tax returns apply for the SVOG?**

Assuming both entities have their own separate legal existence, and each meets the eligibility requirements under the Economic Aid Act, either could apply for an SVOG.

31.     The current version of the FAQ provides the following relevant definitions:

**26. Principal business activity**

An entity's principal business activity is the line of business in which the entity has the greatest combined amount of revenues, expenses, employees and work hours, assets, contracts, and other business activity as compared to all its other lines of business.

**31. Revenue**

a. **Earned revenue or gross earned revenue**

The total of earned revenue from various sales of goods or services, such as admission tickets, merchandise, food and beverages, advertising sales and contracted presentation income. Earned revenue does not include other sources of funds that an organization may receive, such as donations, governmental assistance, or returns on investments.

**36. Subsidiary business**

A subsidiary is an entity that is either wholly or majority-owned and controlled by another entity.

<u>**GENERAL ALLEGATIONS**</u>

*Reedy Group Inc. ("RG")*

32.     RG is a for-profit live venue promoter and live venue operator. RG, through two (2) wholly-owned subsidiaries, owns, operates, and promotes events at what is called the "Entertainment District," which is located in downtown Kalamazoo, Michigan. For this reason, RG's principal business activity is both a live venue operator and promoter. The Entertainment District is a 65,000+ square foot building that contains eight venues and five dedicated stages. The Entertainment District has a total capacity of 3,500 persons, employed, at its peak, 175+ staff, and offered up to 10+ performances during peak season per weekend. These performances

13

consist of performing artists ranging from rock bands, to disc jockeys, to comedians and dueling piano performances.

33.     RG wholly owns both of the subsidiaries included on its SVOG application. As used herein, the term "RG" includes the two wholly owned subsidiaries included in the SVOG application described herein.

34.     RG, via the Entertainment District, has been fully operational since its grand opening in 2001.

35.     RG, via the Entertainment District, intends to resume promoting, hosting, managing, producing, and/or organizing live future events that 1) charge a cover through ticketing or entrance fee and 2) pays performers through either a) a percentage of sales, b) a guarantee, or c) some other mutually beneficial formal agreement as it has done for the past 20 years; excluding, of course, 2020.

36.     RG does not issue securities on a national securities exchange and is not, in any way, owned or operated by any entity that does.

37.     RG has suffered an 85.66% reduction in gross earned revenue during 4th quarter 2020 compared to 4th quarter 2019.

38.     No other entity owns any portion of RG.

39.     RG does not own or operate a venue in any country other than the United States of America.

40.     RG does not own or operate a venue in any other state other than the State of Michigan.

41.     RG does not have more than 500 full-time equivalent employees. At the peak of its operations in 2013, RG had approximately 175 employees. This represents the most employees RG has ever had.

42.     RG is not suspended or debarred from contracting with the federal Government or from receiving federal grants or loans.

43.     Neither RG nor any of its subsidiaries, affiliates, or owners have, in the past five years, been convicted of, plead guilty of, or plead nolo contendere to a criminal offense under the Internal Revenue Code of 1986, nor have they been notified of any unpaid federal tax assessment.

44.     RG does not present live performances of a prurient sexual nature or derive directly or indirectly more than de minimis gross revenue through the sale of products or services. None of the live performances that RG promotes are lustful, lascivious, erotic, overtly sexual, sexually arousing, sexually gratifying, shameful, morbid, and/or entice an unhealthy interest in sex.

45.     RG and/or its subsidiaries, collect admissions fees and gate receipts for the performances at the Entertainment District. RG submitted evidence of this to SBA via: 1) its initial application on April 26, 2021; 2) its first technical correction response on July 6, 2021; 3) its second technical correction response on July 6, 2021; and its 3) August 29, 2021, reconsideration request.

46.     RG received, in 2019, 75.55% of its income from live events' production at the Entertainment District.

47.     RG controls the financial terms of the live event's presentation, use of the Entertainment District's venues, and marketing of the events through its subsidiaries.

48.     RG's principal business activity is promoting live concerts with not less than 70% of its earned revenue coming from ticket sales, cover charges, sales of merchandise, food, beverage, and production fees and/or reimbursements.

49.     Most performances at RG's premises require a ticket purchase or cover charge for entrance. For example, RG's "Spazmatics" event on May 17th, 2019 sold 637 tickets.

50.     RG extensively markets the performances at its venue through multiple outlets including social media, print advertising, radio advertising, and website and

online advertising. For example, RG advertises all venues through multiple online mediums such as Facebook, Google Business, Instagram, Wix Tickets, and Eventbrite Universe. An example of RG's advertising may be found on the Entertainment District's Face page: https://www.facebook.com/EntertainmentDistrict.

51.     RG pays performers through various methods including a percentage of sales and guarantees. For example, RG contracted with and paid a band a guarantee of $4,500 for a 9 pm – 11 pm performance on May 17, 2019.

52.     Each of RG's performance areas have both a defined performance space and a defined audience space. An example of several of these performance areas is **Exhibit O**, which is hereby incorporated by reference as though fully set forth herein.

53.     RG's venues have sound mixing equipment stations, public address systems, and lighting rigs as exhibited by the photos of the Entertainment District in **Ex. O**, which is hereby incorporated by reference as though fully set forth herein.

54.     RG employs, among others, a full time stage manager and a part-time sound engineer and lighting technician. RG's employees also manage its own box office through wix.com and eventbrite.com.

55.     RG is wholly owned by Mr. Ryan Reedy.

56.     SBA "administers the Small Business Development Centers Program," and maintains a Small Business Development Center in Grand Rapids, Michigan, which is within the Western District of Michigan.

57.     No version of the FAQs were ever published in the Federal Register.

58.     Plaintiff, as well as the two subsidiaries on its SVOG Application, is eligible for an SVOG award.

59.     Plaintiff applied for and is entitled to a full combined primary and supplemental SVOG award of $3,576,285.00.

60.     On April 26, 2021, RG applied for an SVOG with two subsidiaries (the "Consolidated SVOG Application"), under RG's Employer Identification Number via

SBA's online SVOG application portal. The Consolidated SVOG Application contained, among other things, RG and its subsidiaries' tax returns and bank statements.

61.    Plaintiff applied for and is entitled to a fully funded primary SVOG award of $2,352,190.00.

62.    Plaintiff applied for and is entitled to a fully funded supplemental SVOG award of $1,224,095.00.

63.    Under the Consolidated SVOG Application, RG is both a promotor and a live venue operator.

64.    On or about June 29, 2021, SBA requested various "technical corrections" for the Consolidated SVOG Application.

65.    On or about July 16, 2021, SBA awarded RG's application, which included two subsidiaries, a $310,677 SVOG. SBA then reduced that amount by RG's previously received Paycheck Protection Program loan of $96,000, such that RG actually received $214,677 of SVOG funds. A true and accurate partially redacted copy of the Notice of Award, SBA Form1222, notifying RG of its award is attached hereto as **Exhibit P** and is hereby incorporated by reference as though fully set forth herein.

66.    Since SBA already reduced RG's SVOG award by RG's previously received Paycheck Protection Program loan in accordance with 15 U.S.C. § 9009a(c)(1)(C)(i), any further award to RG must not be further reduced for Paycheck Protection Program monies.

67.    On or about July 16, 2021, SBA determined RG, via the Consolidated SVOG Application, was an eligible person or entity for an SVOG within the meaning of 15 U.S.C. § 9009a.

68.    The Consolidated SVOG Application contained all of the documentation required by SBA, the EAA, ARPA, and 15 U.S.C. § 9009a.

69.     RG accepted this award amount on July 22, 2021, based on SBA guidance that SVOG recipients must first accept the award before SBA would offer the applicant an opportunity to request reconsideration of the amount awarded.

70.     On or about August 20, 2021, Ryan Reedy, the President of RG, contacted SBA and spoke with SBA representative Marcus Spivey to review the Consolidated SVOG Application. During the course of that review, Mr. Spivey stated, erroneously, that only one tax return had been submitted for the Consolidated SVOG Application and that tax return was for Send 123 LLC, which is in no way related to Plaintiff or Mr. Reedy. Immediately after that statement, the call was disconnected. Thereafter, Mr. Reedy sent Marcus Spivey, an SVOG High Level Customer Support Team member, an e-mail indicating Mr. Spivey had been reviewing the wrong applicant's tax returns. A true and accurate copy of this e-mail is attached hereto as **Exhibit Q** and is hereby incorporated by reference as though fully set forth herein. After reviewing this e-mail, Mr. Spivey called Mr. Reedy back. Mr. Reedy was unavailable, however, Mr. Spivey left a voicemail wherein he stated "I do agree with your e-mail, it did have the wrong information." A true and accurate copy of the transcript of this voicemail as produced by Dialpad, and is attached hereto as **Exhibit R** and is hereby incorporated by reference as though fully set forth herein.

71.     SBA sent RG an invite to apply for reconsideration on August 20, 2021.

72.     RG submitted a reconsideration request the next day.

73.     SBA denied RG's reconsideration request, without reason, seven weeks later on October 18, 2021.

74.     SBA's award of $310,677.00 for the Consolidated SVOG Application is 12.7% of what Plaintiff, via the Consolidated SVOG Application, is entitled to as a primary award.

75.     Pursuant to 15 U.S.C. § 9009a(c)(1)(A)(i)(I), $2,448,190.00, the amount requested via the Consolidated SVOG Application for a primary award, represents 45% of Plaintiffs' gross earned revenue during 2019 (unreduced by Plaintiff's PPP).

76.     Pursuant to 15 U.S.C. § 9009a(c)(2), $1,224,095.00, the amount requested via the Consolidated SVOG Application for a supplemental award, represents 50% of the primary award amount to which Plaintiff is entitled.

77.     Plaintiff, via the Consolidated SVOG Application, submitted, among other required and supplemental documents, both its own and its subsidiaries' federal tax returns for 2019, bank statements, photographs of advertisements for events Plaintiff hosted, promoted, and/or produced, photographs of equipment, photographs from live performances at RG's venues, samples of contracts RG and/or its subsidiaries entered into with performing artists, and records reflecting ticket sales of events RG hosted, promoted, and/or produced.

78.     SBA, its Administrator, and Rivera lack the authority to award SVOG amounts to Plaintiff in amounts lesser than 45% of Plaintiff's 2019 gross earned revenue or $10,000,000; whichever is less.

79.     Attached hereto as **Exhibit S** is a true and accurate copy of the list of SVOG recipients as of October 18, 2021, downloaded from a website SBA maintains: https://data.sba.gov/dataset/svog/resource/33270c2a-f1c5-4dcb-bc98-aedcaec19ef3 (last visited Oct. 25, 2021), which is hereby incorporated by reference as though fully set forth herein.

80.     SBA awarded an initial SVOG of $12,509,999.00 to Dramatists Play Service, Inc."

81.     SBA's award of $12,509,999.00 to Dramatists Play Service, Inc., violates 15 U.S.C. § 9009a(c)(1)(A)(ii) and 15 U.S.C. § 9009(a)(1)(c)(3).

82.     SBA has awarded the maximum of $10,000,000.00 SVOG awards to 193 entities.

83.    SBA awarded an initial SVOG of the statutory maximum amount of $10,000,000 to 165 entities.

84.    SBA awarded three entities: 313 Presents, LLC, Convention/Arena Authority, and Interlochen Center for the Arts, in lower Michigan described by SBA as "Live venue operator or promoter," the maximum SVOG award permitted by statute of $10,000,000.00. **Ex. S**.

85.    SBA awarded the Michigan State University, Wharton Center for Performing Arts a $7,323,547.00 initial SVOG award and a $2,676,453.00 supplemental award amount for a total SVOG award amount of the statutory maximum of $10,000,000.00.

86.    As used in 15 U.S.C. § 9009a(c)(1)(A) and (c)(3), the word "shall" is mandatory, denoting a mandatory duty. *See* <u>Alabama v. Bozeman</u>, 533 U.S. 146, 153-54 (2001); <u>Plaut v. Spendthrift Farm, Inc.</u>, 1 F.3d 1487, 1490 (6th Cir. 1993) (quoting <u>United States v. Monsanto</u>, 491 U.S. 600, 607 (1989)) ("Where the word 'shall' appears in a statutory directive, 'congress could not have chosen stronger words to express the intent that' the specified action 'be mandatory.'").

87.    Pursuant to 15 U.S.C. § 9009a(c)(1)(A) and (c)(3), once an applicant is determined eligible for the SVOG, the amount the applicant, if it was in business before January 1, 2019, as RG was, is to receive is set at the lesser of 45% of its 2019 gross earned revenue or $10,000,000.00.

88.    SBA hosted two "information sessions" via Microsoft Teams related to the SVOG appeal and reconsideration processes. These information sessions were recorded and are available online, but Plaintiff is unable to download the videos.

89.    The first SBA "information session" was on August 4, 2021, from 2:00 to 3:30 p.m. Eastern and concerned appealing SBA SVOG denials (the "Appeal Information Session"). A true and accurate copy of the recording of this Appeal Information          Session          is          available          at:

https://teams.microsoft.com/dl/launcher/launcher.html?url=%2F_%23%2Fl%2Fmeet
up-
join%2F19%3Ameeting_YWJiYmU3OTItMTRlZC00NzRhLWExNDAtZTU4OTcxM
DI3ZGVm%40thread.v2%2F0%3Fcontext%3D%257b%2522Tid%2522%253a%25223
c89fd8a-7f68-4667-aa15-
41ebf2208961%2522%252c%2522Oid%2522%253a%2522fb2d2af5-02f5-4dbb-b8ba-
7d22d256b8f6%2522%252c%2522IsBroadcastMeeting%2522%253atrue%257d%26bt
ype%3Da%26role%3Da%26anon%3Dtrue&type=meetup-join&deeplinkId=3ec0613e-
a82a-44ca-8ddb-
93bd291e4255&directDl=true&msLaunch=true&enableMobilePage=true&suppress
Prompt=true (last visited Nov. 5, 2021) and is hereby referenced as **Exhibit T** and is
incorporated by reference as though fully set forth herein.

90.     In the Appeal Information Session, among other things, SBA stated: "We
cannot provide specific reasons why you may have been declined[.]" [**Ex. T** at 00:05:07
– 00:5:11]. The Appeal Information Session's slide also states "Per standard federal
grant rules, we cannot provide specific reasons why an applicant is declined[.]" [Id.].
Further, SBA stated: "it will not be helpful in this appeal [justification] statement to
refer to other SVOG applicants you feel are similar to your own businesses but which
may have had a different outcome on their final SVOG applications than you did, it
will not be helpful to reference that." [Id. at 00:19:55 – 00:20:10].

91.     The second SBA "information session" was on August 6, 2021, from 2:00
to 3:30 p.m. Eastern and concerned requesting reconsideration of SBA's SVOG award
amount (the "Reconsideration Information Session"). A true and accurate copy of the
recording of this Reconsideration Information Session is available at:
https://teams.microsoft.com/dl/launcher/launcher.html?url=%2F_%23%2Fl%2Fmeet
up-
join%2F19%3Ameeting_ZDVmZWFjMmItYmFmZC00YTM3LWFlNDQtMzE1MGM

yZTI2NTRi%40thread.v2%2F0%3Fcontext%3D%257b%2522Tid%2522%253a%2522
3c89fd8a-7f68-4667-aa15-
41ebf2208961%2522%252c%2522Oid%2522%253a%2522fb2d2af5-02f5-4dbb-b8ba-
7d22d256b8f6%2522%252c%2522IsBroadcastMeeting%2522%253atrue%257d%26bt
ype%3Da%26role%3Da%26anon%3Dtrue&type=meetup-
join&deeplinkId=16c3843e-0bb1-4a9b-bcae-
d6bda33b56aa&directDl=true&msLaunch=true&enableMobilePage=true&suppress
Prompt=true (last visited Nov. 5, 2021) and is hereby referenced as **Exhibit U** and is
incorporated by reference as though fully set forth herein.

92.     In the Reconsideration Information Session, among other things, SBA
stated that it was not going to answer questions related to why an SVOG award
amount was lower than the amount to which the applicant was entitled. [**Ex. U** at
00:04:20 – 00:04:31].

93.     When applying for SVOG reconsideration, SBA's prompt states: "Upload
a detailed statement that explains any discrepancies between your earned revenue
reported to SBA and your federal tax returns." [**Ex. U** at 00:15:56]. The SBA's SVOG
reconsideration portal also prompts: "Please submit documents that directly support
your discrepancy statement." [Id. at 00:26:02].

94.     SVOG applicants can only "appeal" or "request reconsideration" of their
SVOG application's decision once SBA creates the action item for the appeal or
reconsideration request in the applicant's online SVOG portal. **Ex. M** at FAQ #s 228
and 235; **Ex. L** at FAQ #s 228 and 235.

95.     For RG, SBA waited from July 16, 2021, the date it awarded RG the
fractional SVOG award, until August 28, 2021, to provide RG an invitation to request
reconsideration.

96.     SBA's SVOG appeal and reconsideration processes do not have any
published standard rules or procedures.

97.     SBA's SVOG appeal and reconsideration processes are ever evolving. For example, RG, through its counsel, is aware that even after an applicant is denied an SVOG, appeals, and then SBA denies that appeal, SBA is issuing e-mails offering some applicants a third look. In particular, these e-mails state, in part:

> As we processed the initial Shuttered Venue Operators Grant appeals, we saw an opportunity to conduct a more comprehensive evaluation of the applications for those, including yours, who already had an appeal decision. SBA will also use this updated process for appeals that do not yet have a decision, so all appeals will have the same process

## COUNT I

## DEFENDANTS' ACTIONS VIOLATE PLAINTIFF'S FIFTH AMENDMENT RIGHTS

98.     Plaintiff incorporates herein by reference each and every paragraph above as though fully set forth herein.

99.     Plaintiff, pursuant to the mandatory language in 15 U.S.C. § 9009a(c)(1)(A) and (c)(3), has a protectable interest in a $2,352,190.00 initial SVOG award and a $1,224,095.00 supplemental award.

100.    SBA's actions violated Plaintiff's Fifth Amendment rights for numerous and various reasons including but not limited to the fact that:

a.      SBA treats certain establishments, like public universities' performing arts centers, differently from establishments presenting other forms of entertainment, such as Plaintiff's presenting, for example, a rock concert, for no compelling, important, or rational reason;

b.      SBA treats some live venue operator or promoter applicants differently than others, such as Plaintiff, by awarding some live venue operator or promoter applicants the maximum SVOG award of $10,000,000.00, while declining to award Plaintiff the full SVOG amount to which it is entitled under the SVOG statute;

c.      SBA awards some live venue operator or promoter SVOG applicants their full entitled SVOG award amount, including up to the statutory maximum amount of $10,000,000.00, but has refused to award Plaintiff the full SVOG amount to which it is entitled under the SVOG statute for no rational, important, or compelling reason in violation of the Constitution. For example, SBA awarded the maximum SVOG award amount to at least 193 applicants, three of which were live venue operator or promoter applicants in lower Michigan, and refuses to award Plaintiff's Combined SVOG Application its entitled amount for no rational, important, or compelling reason in violation of the Constitution;

d.      Defendants have deprived Plaintiff of its protected interest of a $3,576,285.00 combined SVOG award without adequate process;

e.      Defendants' SVOG appeal and reconsideration processes violates Plaintiff's Due Process rights;

f.      Defendants' SVOG appeal and reconsideration process did not afford Plaintiff an opportunity to be heard in a meaningful manner because, among other reasons, at no point was Plaintiff informed of the basis for Defendants' decisions such that Plaintiff was left to guess as to the reason or reasons why Defendants awarded Plaintiff an SVOG  amount far below that to which Plaintiff is statutorily entitled to and Plaintiff was then expected to rebut those unknown reasons;

g.      Defendants' reconsideration and/or appeal notice(s) did not give Plaintiff a clear statement of the theory on which the agency will proceed with the appeal and/or reconsideration, in violation of the minimum requirements of Due Process;

h.      Defendants' reconsideration and/or appeal notice(s) withheld important pieces of information such as, for example, a basis for which SBA

24

made its adverse decision(s). This information and evidence is necessary, pursuant to the Fifth Amendment's Due Process Clause, to ensure Plaintiff had an adequate and real opportunity to participate in the reconsideration and/or appeal process;

i.    SBA's SVOG appeal and/or reconsideration processes is completely made up; they find no basis in any statutory or regulatory provision;

j.    SBA's SVOG appeal and/or reconsideration processes do not provide the minimum requirements of Due Process under the Fifth Amendment;

k.    Defendants have deprived Plaintiff of its property and liberty interests in a $3,576,285.00 combined SVOG award through arbitrary and capricious action, by, among other things, determining Plaintiff, via the Consolidated SVOG Application, was eligible for an SVOG, but then unilaterally reducing the amount of Plaintiff's SVOG award in violation of 15 U.S.C. § 9009a;

l.    Defendants have deprived Plaintiff of its property interest in a fair reconsideration process that conforms with the requirements of Due Process under the Fifth Amendment;

m.    Defendants' decision to award a mere 12.7% of Plaintiff's entitled primary SVOG amount and 8.6% of the total (combined primary and supplemental) amount shocks the conscious and is otherwise arbitrary and capricious, as stated herein, because, among other reasons, Plaintiff submitted sufficient and necessary evidence to SBA to demonstrate Plaintiff is eligible for a $3,576,285.00 SVOG award and Plaintiff is fully eligible for SVOG awards, as Defendants have so stated by awarding RG an SVOG, yet, Defendants

refused to follow the mandatory language of the SVOG statute when determining the award amount;

n.      Defendants treat some First Amendment-protected businesses differently by, for example, providing SVOG awards, including full SVOG amount awards, to businesses exhibiting other forms of protected entertainment such as ballet and theater productions, while denying Plaintiff its full SVOG amount; and

o.      Defendants' have arbitrarily and capriciously applied the 15 U.S.C. § 9009a, including by violating its express provision capping SVOG awards at $10,000,000.00, as well as the Program Guides.

101.    As a direct and proximate result of Defendants', and their delegates', unconstitutional actions against Plaintiff and Plaintiff's interests, all as referenced above, Plaintiff has suffered and will continue to suffer irreparable injuries, including, but not limited to financial ruin, business ruination, and, violation of their Fifth Amendment rights, and the inability to present, view, and/or engage in First Amendment-protected speech, expression, and entertainment.

102.    Because of Defendants' violation of Plaintiff's Fifth Amendment rights, as referenced above, this Court has the authority to declare the rights and the legality of actions of various parties and should do so here.

103.    Plaintiff does not have adequate remedies at law because, among other reasons, the violation of its Fifth Amendment rights cannot be undone and it cannot recover damages against the Defendants as a result of governmental immunity. In addition, Plaintiff has a substantial likelihood of success on the merits in regard to its claims asserted herein. Consequently, and because of the irreparable harm that is being suffered by Plaintiff, and which will continue to be suffered by Plaintiff if this Court does not grant preliminary relief, Plaintiff is entitled to a preliminary injunction in order to protect its fundamental rights at issue here.

104. For the reasons set forth above, Plaintiff is entitled to judicial review with regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

## COUNT II

**VIOLATIONS OF THE APA: ARBITRARY AND CAPRICIOUS DECISION MAKING; ACTION CONTRARY TO LAW; DECISION UNSUPPORTED BY SUBSTANTIAL EVIDENCE; AND ABUSE OF DISCRETION**

105. Plaintiff incorporates herein by reference each and every paragraph above as though fully set forth herein.

106. Plaintiff's claims under this Count are ripe for review as administrative remedies have been exhausted.

107. SBA's decision to award Plaintiff a primary SVOG award amount of $310,677.00 is a final agency action subject to judicial review.

108. SBA's decision not to increase the Consolidated SVOG Application's award of $310,677.00 after Plaintiffs' Reconsideration/Appeal thereof, is also a final agency action subject to judicial review.

109. SBA's decisions, as to Plaintiff's SVOG application, reconsideration requests, and/or appeal requests, are contrary to and violative of the APA for numerous and various reasons including but not limited to:

    a. SBA's decisions conflict with the evidence Plaintiff presented to Defendants in its application, technical corrections, appeals, and/or reconsideration requests;

    b. SBA has treated Plaintiff disparately from similarly situated businesses that were granted SVOG awards. Specifically, SBA has approved the SVOG applications of various other live performance venues in the Kalamazoo Community and has provided the maximum SVOG award to at least three other live venue or promoter applicants in the lower Michigan area. Moreover, SBA has approved the SVOG applications and provided the maximum amount of funding allowable to multiple government-associated

entities with other funding sources such as massive endowments, like the Michigan State University Wharton Center and, the Kent County-Grand Rapids Center for Performing Arts;

      c.     SBA's decisions run counter to the evidence before the agency as multiple indicators, like, for example Plaintiff's revenue losses in 2019 and Plaintiff's affirmations in its applications, technical corrections, reconsideration requests, and/or appeals, all indicate Plaintiff is 1) eligible for an SVOG award and 2) eligible for a combined SVOG award of $3,576,285.00;

      d.     SBA failed to consider relevant data including, but not limited to, Plaintiff's 2019 gross earned revenue when making its decisions;

      e.     SBA failed to articulate an explanation for the rational connecting various facts found to the choice made. Information such as, but not limited to, how Plaintiff's 2019 gross earned revenue and how that effected SBA's decisions;

      f.     SBA utterly failed to consider evidence and circumstances that would warrant different decisions; information including, but not limited to, Plaintiff's 2019 gross earned revenue;

      g.     SBA misapplied the SVOG by not awarding, pursuant to mandatory language, Plaintiff an SVOG amount, after concluding Plaintiff's eligibility for the program via awarding the Consolidated SVOG Application a partial award, less than 45% of Plaintiff's 2019 gross earned revenue, an amount which is less than $10,000,000;

      h.     SBA's decision as to Plaintiff undercuts its decisions to award full SVOG amounts to other eligible entities, including at least three other live venue operator or promoter applicants in the lower Michigan area, and in at least one case, an amount higher than that which is permitted by statute;

i.      SBA's decisions ignore its guidance posted on its own website. By way of example, and there are more, SBA's website states "Grant amounts will reflect either of the following instances: [1] for an eligible entity in operation on January 1, 2019, grants will be for an amount equal to 45% of their 2019 gross earned revenue OR $10 million, whichever is less." SBA awarded Plaintiff an amount equal to 12.7% of Plaintiff's primary eligible amount and awarded at least one entity an SVOG amount greater than $10,000,000.00;

j.      SBA's decisions ignore its own Program Guidance;

k.      SBA's decisions ignore its own website;

l.      SBA's decisions ignore 15 U.S.C. § 9009a;

m.      SBA failed to provide a reasoned explanation for its decision to award Plaintiff's Combined SVOG Application a $310,677.00 SVOG;

n.      SBA failed to provide any explanation for its decision to award Plaintiff's Combined SVOG Application a $310,677.00 SVOG;

o.      SBA failed to provide a reasoned explanation for its decision to deny Plaintiff's reconsideration request and/or appeal of the award amount for Plaintiff's Consolidated SVOG Application;

p.      SBA's decisions related to Plaintiff's Consolidated SVOG Application are not supported by any evidence in the record, let alone substantial evidence. Plaintiff's Consolidated SVOG Application, Plaintiff's technical corrections thereto, and the appeal and/or reconsideration request associated therewith demonstrated Plaintiff's eligibility for a $3,576,285 SVOG award; and

q.      Congress did not delegate authority to Defendants to alter the statutory formula found in 15 U.S.C. § 9009a(c)(1)(A) and (c)(2)-(3) regarding SVOG award amounts, thus, SBA is without authority to, once an eligibility

determination is made, award amounts inconsistent with the statutory guidelines cited above.

110. By awarding Plaintiff's Consolidated SVOG Application an amount less than Plaintiff's full entitlement thereto, and making decisions related thereto without, for example, examining relevant facts or making adequate findings and explanations, Defendants' actions are arbitrary, capricious, an abuse of discretion, illogical, inconsistent with their reasoning, inconsistent with the SVOG statute, otherwise not in accordance with the law, and/or were made without observance of procedure required by law. As such, SBA's denial of Plaintiff's Consolidated SVOG Application's reconsideration request and/or appeal should be set aside under the APA.

## COUNT III

### CLAIM FOR ATTORNEYS FEES AND COSTS UNDER THE EQUAL ACCESS TO JUSTICE ACT – 28 U.S.C. § 2412(d)

111. Plaintiff incorporates herein by reference each and every paragraph above as though fully set forth herein.

112. 28 U.S.C. § 21412(d)(a)(A) provides:

Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

113. Defendants' have provided no basis for denying Plaintiff's SVOG award reconsideration request.

114. Defendants have provided no basis for awarding Plaintiff an SVOG amount lesser than the amount to which Plaintiff is entitled under the SVOG statute.

115.    The position of the Defendants is not substantially justified, nor do special circumstances exist that would make an award unjust.

116.    Upon prevailing on the foregoing claims, Plaintiff is entitled to an award of attorney fees in accordance with 28 U.S.C. § 2412.

## **PRAYER FOR RELIEF**

A.    Issue orders granting a Temporary Restraining Order, Preliminary, and Permanent Injunction enjoining the Defendants, as well as their employees, agents, and representatives, from awarding SVOG amounts to applicants in amounts less than 45% of the applicant's 2019 gross earned revenue or $10,000,000, whichever is lesser. As part of these orders, Plaintiff further requests this Honorable Court to:

1)    Order Defendants to expeditiously prepare the record for review no later than November 11, 2021, to meet and confer with Plaintiff regarding appropriate exclusions therefrom and/or redactions thereto, and submit it to the Court no later than November 16, 2021;

2)    Order Defendants to consider Plaintiff's SVOG application consistent with applicable law and the evidence before SBA;

3)    Award Plaintiff's Consolidated SVOG Application a $3,576,285 SVOG by awarding an additional combined (primary and supplemental) award of $3,361,608.00, which represents the outstanding amount RG is entitled to; or, alternatively; and

4)    Order Defendants to set aside guaranteed SVOG funding for RG in the amount of $3,361,608.00 pending a decision on the merits;

B.    Declare unlawful and set aside Defendants' SVOG award decisions as to Plaintiff's Consolidated SVOG Application;

C.    Enter an award of attorneys' fees and costs against the Defendants and in favor of Plaintiff pursuant to 28 U.S.C. § 2412 and/or all other applicable authorities; and otherwise

      D.     Enter such other and further relief as this Court may find to be just and proper in these circumstances.

                                    Respectfully submitted,

Dated: November 5, 2021

                                    */s/ Matthew J. Hoffer*
                            Matthew J. Hoffer (P70495)
                            Matt@BradShaferLaw.com
                            Zachary M. Youngsma (MI P84148)
                            Zack@BradShaferLaw.com
                            **SHAFER & ASSOCIATES, P.C.**
                            3800 Capital City Boulevard, Suite 2
                            Lansing, Michigan 48906
                            T: 517-886-6560
                            F: 517-886-6565

                            *Attorneys for Plaintiff*

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

**VERIFICATION OF COMPLAINT AS TO:**
**Reedy Group Inc.**

1.      I, Ryan Reedy, am the President of Reedy Group Inc.

2.      I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.      I have reviewed the foregoing *PLAINTIFF'S VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND REVIEW OF ADMINISTRATIVE ACTION* (the "Complaint") in its entirety.

4.      The factual statements in the Complaint are true and accurate to the best of my information, knowledge, and belief.

5.      Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: __11/5/2021__

By:    Ryan Reedy